## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| G.Y.J.P.,* A MINOR CHILD, by and through her mother and Next Friend, M.R.P.S.,* c/o American Civil Liberties Union 125 Broad Street, 18th Floor New York, NY 10004 | ) ) ) ) ) )  Case: 1:20–cv–01511 Assigned To : McFadden, Trevor N. Assign. Date : 6/9/2020 Description: TRO/PI (D–DECK) |
| *Plaintiff*, | )  No. 2020-cv-_____ |
| v. | ) |
| CHAD F. WOLF, ACTING SECRETARY OF HOMELAND SECURITY, in his official capacity, Department of Homeland Security 245 Murray Lane SW Washington, DC 20528; | ) ) ) ) ) |
| MARK A. MORGAN, ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION ("CBP"), in his official capacity, U.S. Customs and Border Protection 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) ) ) |
| TODD C. OWEN, EXECUTIVE ASSISTANT COMMISSIONER, CBP OFFICE OF FIELD OPERATIONS, in his official capacity CBP Office of Field Operations 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) ) |
| RODNEY S. SCOTT, CHIEF OF U.S. BORDER PATROL, in his official capacity U.S. Border Patrol 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) |
| MATTHEW T. ALBENCE, DEPUTY DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, in his official capacity U.S. Immigration and Customs Enforcement, 500 12th Street SW Washington, DC 20536; | ) ) ) ) ) ) ) |
| ALEX M. AZAR II, SECRETARY OF HEALTH AND HUMAN SERVICES, in his official capacity, U.S. Department of Health and Human Services Hubert H. Humphrey Building 200 Independence Ave. SW Washington, D.C. 20201; | ) ) ) ) ) ) ) |



**RECEIVED**

JUN - 8 2020

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

DR. ROBERT R. REDFIELD, DIRECTOR OF THE           )
CENTERS FOR DISEASE CONTROL                        )
AND PREVENTION, in his official capacity,          )
Centers for Disease Control and Prevention         )
1600 Clifton Road                                  )
Atlanta, GA 30329;                                 )
                                                   )
HEIDI STIRRUP, ACTING DIRECTOR OF THE              )
OFFICE OF REFUGEE RESETTLEMENT, in her             )
official capacity                                  )
Office of Refugee Resettlement,                    )
330 C Street SW, 5th Floor                         )
Washington, D.C. 20201;                            )
                                                   )
*Defendants*.                                      )
                                                   )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Trafficking Victims Protection Reauthorization Act of 2008, Refugee Act, Foreign Affairs Reform and Restructuring Act of 1998, Immigration and Nationality Act, and Administrative Procedure Act)

*Proceeding under pseudonym.

## INTRODUCTION

1.      This case presents the first legal challenge to the government's unprecedented new system for restricting immigration along the Canadian and Mexican borders in the name of public health and under the purported authority of 42 U.S.C. § 265.  This system is established in a set of agency documents—a new regulation, several orders, and an implementation memo— which Plaintiff collectively refers to as the "Title 42 Immigration Process" or "Title 42 Process."

2.      Among other things, the Title 42 Process authorizes the summary expulsion of unaccompanied minors without any procedural protections—even if the child shows no signs of having COVID-19, and even if the child is fleeing danger and seeking protection in the United States.

3.      Plaintiff G.Y.J.P. is a 13-year-old girl from El Salvador.  Her mother, a former police officer in El Salvador, was targeted by the notorious Salvadoran gangs after she refused to cooperate with them.  Forced to quickly flee for her life, she was granted legal protection by the United States and now lives here lawfully.  In April 2020, Plaintiff sought to join her mother in the United States, when the gangs who had targeted her mother began threatening her life in El Salvador.

4.      When G.Y.J.P. arrived in the United States, she informed officials that she was fleeing danger, that her mother lives here, and that she had her mother's phone number.  The officials did not contact her mother or process her for transfer to an Office of Refugee Resettlement ("ORR") facility for unaccompanied children.  Instead, pursuant to the Title 42 Process, they summarily deported her to El Salvador without a hearing or any process.  Plaintiff displayed no symptoms of COVID-19.

5.      Prior to the Title 42 Process, and pursuant to longstanding immigration statutes protecting children and those seeking protection, G.Y.J.P. should have been given shelter in a children's facility until she could be released to her mother, and she would have been entitled to a full hearing, and appeals, to determine her right to seek safety in the United States with her mother.

6.      Through the Title 42 Process, the Administration has sought to usurp Congress's role and bypass the entire immigration statutory scheme.  Specifically, the Administration contends that public health provisions in Title 42 of the U.S. Code—provisions that have rarely been used and never in this way—entitle it to set aside the immigration laws.

7.      But those public health provisions do not authorize this unprecedented Title 42 Immigration Process.  Title 42 authorizes various powers, such as testing and quarantines, but has never been interpreted to authorize the broad powers the government is claiming here.  And even if Title 42 permits the expulsion of some individuals, that power would not apply to children or those seeking protection from persecution or torture.  The statutes protecting children and those seeking protection were enacted after the Title 42 provisions and contain no exception for individuals with communicable diseases.

8.      In fact, communicable diseases have a long history in immigration law, and Congress has squarely addressed how to handle them.  Under the specific immigration provisions enacted by Congress, if a border official suspects that an arriving noncitizen has a communicable disease deemed serious by the government, the official has numerous options, including testing and even quarantine.  But children and others seeking protection may under no circumstances be deported without a hearing to determine their right to remain in the United States (even if that means a period of quarantine is required).  The Administration's use of Title 42 is a transparent end-run

around Congress's considered decision to provide protection to children and others fleeing

danger even where communicable disease is a concern—and to address that concern through the

use of testing and quarantines, not deportations.

9.      Not only does the Title 42 Process violate the immigration statutes, but its application to

Plaintiff G.Y.J.P. is patently arbitrary and capricious from a public health standpoint.

10.     The principal stated justifications for the Title 42 Process is that it is necessary to protect

border officers and that the introduction of persons into congregate settings poses a danger to

public health.  Specifically, the government asserts that when a person arrives at the border

seeking protection and lacks a visa, border agents from the Department of Homeland Security

("DHS") will be forced to spend additional time screening the individual under the immigration

laws, thereby exposing the officers to great danger.  But as public health experts have uniformly

explained, numerous safety measures are available, including social distancing, face masks, and

gloves.  Under the normal operation of the immigration laws, Plaintiff would have been promptly

sent to a shelter where trained workers would have cared for her, or to the custody of her mother,

who would have ensured she stayed safe.

11.     Moreover, under the regular operation of immigration laws governing children, an

unaccompanied child who arrives from Central America, like Plaintiff, is transferred to the

custody of ORR within 72 hours of the child's apprehension.

12.     Instead, Plaintiff remained in immigration custody for much longer than 72 hours in order

for Defendants to arrange for her return to El Salvador, increasing the risk of exposure to

COVID-19 for Plaintiff and border enforcement agents.  Thus, the Title 42 Process *increases* the

amount of time children spend with border agents, because it takes time to find air transportation

to deport them.

13.     Whatever the Administration's motivation for applying the Title 42 Process to children and adults seeking protection, the Process is unlawful.  Plaintiff is in grave danger in El Salvador and must be given the opportunity to return to the United States to receive the statutory protections to which she is entitled under the laws passed by Congress.

## JURISDICTION AND VENUE

14.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); and the Public Health Services Act of 1944, 42 U.S.C § 264, *et seq.*

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  *See also* 5 U.S.C. § 702 (waiver of sovereign immunity).

16.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and Defendants reside in this District.

## PARTIES

**Plaintiff**

17.     Plaintiff G.Y.J.P. is a 13-year-old girl from El Salvador, who fled to seek protection in the United States.  After she entered the United States, she was subjected to the Title 42 Process and deported to El Salvador, where she fears for her life.  She seeks to return to the United States

to seek protection from persecution and torture.  She sues by and through her mother and Next Friend, M.R.P.S.

**Defendants**

18.     Defendant Chad Wolf is the Acting Secretary of Homeland Security, which is a cabinet-level department of the U.S. government.  In that capacity, Defendant Wolf is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.  DHS's components include U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

19.     Defendant Mark A. Morgan is the Acting Commissioner of CBP.  He is sued in his official capacity.  In that capacity, he directed the issuance of the CBP's memorandum implementing expulsions under the Title 42 Process, and is a supervisory official responsible for implementing the Title 42 Process.  CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.  CBP is responsible for implementing the Title 42 Process and conducts expulsions pursuant to its terms.

20.     Defendant Todd C. Owen is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO").  He is sued in his official capacity.  OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry.  Defendant Owen is a supervisory official responsible for implementing the Title 42 Process at ports of entry.

21.     Defendant Rodney S. Scott is the Chief of U.S. Border Patrol. He is sued in his official capacity.  Border Patrol is responsible for border security between ports of entry.  Defendant

Case 1:20-cv-01511-TNM   Document 3   Filed 06/09/20   Page 8 of 31

Scott is a supervisory official responsible for implementing the Title 42 Process between ports of entry.

22.     Defendant Matthew T. Albence is the Deputy Director of ICE, and is the Senior Official Performing the Duties of the Director.  ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.  Defendant Albence is sued in his official capacity.

23.     Defendant Alex M. Azar II is the Secretary of Health and Human Services ("HHS"), which is a cabinet-level department of the U.S. government.  He is sued in his official capacity. In that capacity, Defendant Azar is responsible for the oversight of both the Centers for Disease Control ("CDC") and the Office of Refugee Resettlement ("ORR"), which are components of HHS.

24.     Defendant Dr. Robert R. Redfield, M.D., is the Director of the CDC.  He is sued in his official capacity.  In that role, he authorized the Title 42 Process at issue in this case.

25.     Defendant Heidi Stirrup is the Acting Director of ORR.  She is sued in her official capacity.  ORR is statutorily responsible for the care and custody of unaccompanied children in federal immigration custody.  The agency oversees a network of shelters and facilities that house unaccompanied children; evaluates potential sponsors for the children; and operates various programs designed to ensure that unaccompanied children access certain procedural protections in their removal proceedings.  The agency is a component of HHS.  In that role, Defendant Stirrup oversees the care and custody of unaccompanied children in immigration custody.

## FACTS

### Unaccompanied Children in the Immigration System

26.     Every day, unaccompanied children flee persecution and danger in their home countries and journey to the United States seeking safety.  Many of them come from El Salvador, Honduras, and Guatemala because of the escalating influence of powerful gangs that control large swaths of these countries and frequently target children.  Many unaccompanied children from these Central American countries are also fleeing gender-based, family-based, and other types of violence.

27.     In recognition of the unique vulnerabilities of unaccompanied children and their critical need for protection, Congress has passed two laws to guarantee their proper care and facilitate their efforts to seek humanitarian relief.

28.     In 2002, Congress included provisions in the Homeland Security Act that transferred responsibility for the care and custody of unaccompanied children from the former Immigration and Naturalization Service to ORR, which is part of HHS.  6 U.S.C. § 279(a).  Congress enacted this provision because it saw that immigration enforcement-oriented agencies were ill-equipped to care for unaccompanied children.  Congress therefore vested responsibility for the care of unaccompanied children, including the provision of housing and access to legal services to pursue claims for immigration relief, in an agency—ORR—that had demonstrated experience working with vulnerable immigrants and refugees.

29.     In 2008, Congress then enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232, which established even stronger protections for unaccompanied children.  The TVPRA created a number of significant safeguards concerning the care, custody,

and removal proceedings of unaccompanied children, and confirmed ORR's responsibility to ensure their care.[1]

30.     Under the TVPRA, unaccompanied children from "noncontiguous countries"—i.e., countries other than Canada and Mexico—must be transferred to ORR custody within 72 hours after their apprehension, absent exceptional circumstances.  8 U.S.C. § 1232(b)(3).  Children from Canada and Mexico are subject to an initial screening to determine whether they must be referred to ORR custody.  8 U.S.C. § 1232(a)(2)(A)(i)-(iii), (a)(3).

31.     After referral from CBP, ORR is responsible under the statute for housing and caring for unaccompanied children.  8 U.S.C. § 1232(c).  The statute requires ORR to "promptly" place the child "in the least restrictive setting that is in the best interest of the child."   8 U.S.C. § 1232(c)(2)(A).  Such placements can include referral to shelters or care facilities operated by entities that contract with ORR.

32.     ORR does not operate its own housing facilities for unaccompanied children.  Instead, ORR contracts with providers throughout the country who operate shelters, group homes, foster care programs, and other living situations for the children.  The shelter providers take care of the children's day-to-day needs, such as food, housing, education, and medical treatment.  The providers operate under ORR's direction and supervision, and must comply with federal standards and ORR guidelines governing the care of unaccompanied children.

33.     ORR is also statutorily required to evaluate options for the child's release from federal custody to a family member or other adult who can care for the child.  8 U.S.C. § 1232(c)(3)(A).  Often, unaccompanied children traveling to the United States can reunite with parents or family members already here, which enables ORR to facilitate swift releases.

---

[1] Although the TVPRA refers to HHS, ORR (as an HHS subagency) carries out these statutory functions.

34.     The TVPRA also includes safeguards concerning the removal proceedings of unaccompanied children from noncontiguous countries, and those children from contiguous countries who pass the screening.  Most importantly, if DHS seeks to remove a child, the child must be put into full removal proceedings before an immigration judge, with the opportunity for an administrative appeal and review in the court of appeals.  Children cannot be removed via fast-track removal processes applicable to others.  8 U.S.C. § 1232(a)(5)(D)(i).

35.     Unaccompanied children are also entitled to other statutory procedural protections, including access to counsel, 8 U.S.C. § 1232(a)(5)(D)(iii), and eligibility for the appointment of a child advocate to look out for their interests, 8 U.S.C. § 1232(c)(6).  Through these provisions, Congress recognized that unaccompanied children require special safeguards to ensure their full access to humanitarian relief from removal.

36.     In short, a unaccompanied child from a country like El Salvador must automatically be allowed to remain in the country, transferred within 72 hours to ORR custody, and placed in full immigration proceedings, where she can apply for asylum and other protections under which she may ultimately receive permission to remain in the United States.  There is no screening before the child is transferred to ORR and placed in immigration proceedings, other than checking that she is unaccompanied and from a non-contiguous country.

37.     Even apart from the TVPRA, unaccompanied children, like other noncitizens, have statutory rights to seek relief in the United States from persecution and torture.  Three forms of relief are possible: asylum, withholding of removal, and protection from torture.

38.     The Immigration and Nationality Act ("INA") provides, with certain enumerated exceptions—that do not include public health concerns—that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated

port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C.
§ 1158(a)(1).  To qualify for asylum, a noncitizen must show a "well-founded fear of
persecution" on account of a protected ground.  8 U.S.C. § 1101(a)(42)(A).  Congress has
expanded asylum eligibility for unaccompanied children, by exempting them from various
requirements applicable to adults, including the one-year deadline for filing an application.  8
U.S.C. § 1158(a)(2)(E).

39.     Second, in keeping with this country's obligations under the 1951 Refugee Convention
and the 1967 Protocol relating to the Status of Refugees, Congress has barred the removal of an
individual to a country where it is more likely than not that she would face persecution on a
protected ground.  8 U.S.C. § 1231(b)(3).  This form of relief, known as "withholding of
removal," requires the applicant to meet a higher burden with respect to the likelihood of harm
but is mandatory if the standard is met.

40.     Third, the Convention Against Torture ("CAT"), implemented by FARRA, prohibits the
government from returning a noncitizen to a country where it is more likely than not that she
would face torture.  *See* 8 U.S.C. § 1231 note.

**The Treatment of Communicable Diseases Under the Immigration Laws**

41.     The immigration system has long had to deal with communicable diseases.  Congress has
thus enacted specific immigration provisions to address them, dating back to the late 1800s when
Congress first began regulating immigration.

42.     8 U.S.C. § 1182(a)(1) contains various "health-related" grounds of inadmissibility.  The
statute applies to various noncitizens who present specified public health concerns, such as
noncitizens who have "communicable disease[s] of public health significance," *id.*
§ 1182(a)(1)(A)(i); who have not been vaccinated against certain widespread infectious diseases

(e.g., mumps, measles, rubella), *id.* § 1182(a)(1)(A)(ii); who have "physical or mental disorder[s]" that may present "threat[s] to the property, safety, or welfare" of self or others, *id.* § 1182(a)(1)(A)(iii); or "drug abuser[s] or addict[s]," *id.* § 1182(a)(1)(A)(iv).  But these statutes do not permit the deportation of individuals without a screening for persecution or torture, and do not permit the summary deportation of children in violation of the TVPRA.

43.     The immigration statute also contains a detention provision that applies to certain noncitizens "arriving at ports of the United States" who may be inadmissible on the health-related grounds, or who come "from a country or have embarked at a place where any of such diseases are prevalent or epidemic."  8 U.S.C. § 1222(a).  Such noncitizens may only be detained "for a sufficient time to . . . subject [them] to observation and an examination," *id.*, but may not be deported without a screening for persecution or torture as the immigration statutes require.

## The Administration's Efforts to Bar Immigrants and the New Title 42 Process

44.     The current Administration has repeatedly and publicly stated that restricting access to asylum, as well as eliminating the TVPRA, are among its key immigration objectives.  The President, his close advisors, and a succession of agency officers have repeatedly stated that the TVPRA creates a "loophole" in the border that they seek to close.  They have characterized unaccompanied children as dangerous gang members seeking to exploit the immigration laws.

45.     The administration has also sought to use numerous regulatory and policy mechanisms to prevent noncitizens from seeking protection in this country, but the Title 42 Process at issue here goes further than any of those efforts because it leaves almost no avenue open to seek protection.

46.     Before COVID-19, Administration officials discussed using public health powers to restrict immigration and circumvent the protections in the immigration laws.

47.     Notwithstanding the clear statutory framework that requires the United States to allow people arriving at the border (with or without valid travel documents) to apply for asylum, withholding of removal, and CAT relief, and to provide special protections to unaccompanied children, the President announced on March 20, 2020, that the CDC would issue an order pursuant to the public health provisions of Title 42 of the U.S. Code "to suspend the introduction of all individuals seeking to enter the U.S. without proper travel documentation" across the northern and southern borders.  The President stated that the order would be executed by "immediately returning" such individuals "without delay."

48.     The specific provision of Title 42 invoked by the Administration was § 265.  That provision dates to 1893 and was later reenacted in substantially the same language in the modern Public Health Service Act of 1944.  Section 265 provides in relevant part: the Surgeon General may "prohibit . . . the introduction of persons or property" from designated places where "by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States."[2]

49.     Deportation has never been an available penalty under § 265, and in fact, § 265 applies to both noncitizens and citizens.  Rather, the Public Health Service Act prescribes certain civil and criminal penalties for violations of § 265, including "a fine of not more than $1,000 or . . . imprisonment for not more than one year, or both."  42 U.S.C. § 271(a).

50.     Although § 265 and its predecessors have existed since 1893, no regulation implementing that statute has ever authorized the broad immigration powers Defendants are claiming here.

---

[2] In 1966, the Surgeon General transferred its § 265 authority to what is now HHS.  In 2001, HHS delegated this authority to the CDC.  The President's functions under § 265 were assigned to the Secretary of HHS in a 2003 executive order.

51.   To exercise this new immigration power, the CDC thus issued a new regulation, without

advance notice and comment, on the same day as the President's announcement.  Control of

Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United

States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg.

16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020).

52.   Specifically, the regulation added a new provision, 42 C.F.R. § 71.40, which provides

that the CDC may prohibit the "introduction into the United States of persons" from foreign

countries.  85 FR at 16,563; *see* 42 C.F.R. § 71.40(a).  The public notice of the regulation

interpreted the "introduction of persons" in 42 U.S.C. § 265 to "encompass those who have

physically crossed a border of the United States and are in the process of moving into the interior

in a manner the [CDC] Director determines to present a risk of transmission of a communicable

disease."  85 FR at 16,563; *see* 42 C.F.R. § 71.40(b)(1).  And it interpreted "serious danger of the

introduction of [a particular communicable] disease into the United States" in § 265 as meaning

"the potential for introduction of vectors of the communicable disease into the United States,

even if persons or property in the United States are already infected or contaminated with the

[same] communicable disease."  85 FR at 16,563; *see* 42 C.F.R. § 71.40(b)(2).

53.   The regulation exempted U.S. citizens, lawful permanent residents ("LPRs"), and

members of the armed forces, stating that the "CDC believes that, at present, quarantine,

isolation, and conditional release, in combination with other authorities, while not perfect

solutions, can mitigate" the spread of COVID-19 by such individuals.  85 FR at 16,564; *see* 42

C.F.R. § 71.40(e), (f).

54.   The regulation also provides that, if an order suspending the introduction of persons "will

be implemented in whole or in part" by CBP, "then the [CDC] Director shall, in coordination

with the Secretary of Homeland Security or other applicable Federal department or agency head,

explain in the order the procedures and standards by which any authorities or officers or agents

are expected to aid in the enforcement of the order."  42 C.F.R. § 71.40(d)(2); *see* 85 FR at

16,564.

55.     Pursuant to its new regulatory authority, the CDC issued a 30-day "Order Under Sections

362 and 365 of the Public Health Service Act [42 U.S.C. §§ 265, 268] Suspending Introduction

of Certain Persons From Countries Where a Communicable Disease Exists."  85 Fed. Reg.

17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020).  The Order directed the

"immediate suspension of the introduction" of certain persons, referred to as "covered aliens."

85 FR at 17,067.  "Covered aliens" are those seeking to enter the United States through Canada

or Mexico who "seek[] to enter . . . at POEs [ports of entry] who do not have proper travel

documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near

the border seeking to unlawfully enter the United States between POEs."  85 FR at 17,061.

Section 365 of the Act, codified at 42 U.S.C. § 268, provides that "[i]t shall be the duty of the

customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and

regulations."  42 U.S.C. § 268(b).

56.     A principal justification for these restrictions was that "[t]he introduction into congregate

settings in land POEs and Border Patrol stations" of such individuals risks "transmission and

spread of COVID-19 to CBP personnel" and others.  85 FR at 17,061.

57.     The Order directs the forcible return of individuals back to the country from which they

entered (Canada or Mexico), their home country, or another location.  85 FR at 17,067.

58.     Although the Order is issued by the CDC, and the regulation provides that the CDC and

DHS must coordinate in developing corresponding procedures and standards, 42 C.F.R.

§ 71.40(d)(2), the Order states that CBP "developed an operational plan for implementing the order."  85 FR at 17,067.

59.     In addition to repeating the regulatory exceptions for U.S. citizens and LPRs, the Order exempts from the ban the spouses and children of citizens and LPRs (whether or not they have valid documents); persons from foreign countries with valid travel documents; and persons from countries in the visa waiver program who present at ports of entry.  85 FR at 17,061.  The visa waiver program applies to nationals of 39 countries.

60.     The Order also states that DHS customs officers could, in their discretion, determine that a noncitizen "should be excepted [from the Order] based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  85 FR at 17,061.  Other than stating that a supervisor must approve such exceptions, the Order contains no standards or further procedures for exercising that discretion.  *See id.*

61.     The Order and regulation are silent on their application to individuals seeking asylum, withholding of removal, or CAT protection, and are likewise silent regarding their application to unaccompanied children.

62.      The March 20 Order was extended for an additional 30 days on April 20, 2020.  Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020).

63.     On May 20, 2020, the CDC extended the Order indefinitely, and amended it to cover both land and coastal ports of entry and Border Patrol stations.  Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020).

64.     The May 20 amended Order acknowledges that "certain areas of the country are beginning a phased reopening of their communities," but states that "[a]t this critical juncture, it would be counterproductive to . . . relax[] restrictions" on the immigration of persons "who pose a risk of further introducing COVID-19 into the United States."  85 FR at 31,505.  As with the prior two 30-day Orders, a principal justification articulated for the indefinite Order was the danger to border agents who would have to inspect persons who come without documents.

65.     The CDC acknowledged that there were alternatives to expulsion but concluded that it was not worth the resources for those, like children and asylum seekers, who lacked documents. The CDC also presumed, without evidence, that those without documents covered by the Order would lack a means of self-quarantining.

**CBP's Implementation of the Title 42 Process**

66.     On April 2, 2020, CBP issued a memorandum ("CBP Memo") describing the agency's implementation of the Title 42 Process, an effort it calls "Operation Capio."  CBP Memo 2.

67.     To determine whether a noncitizen is "subject to the CDC Order," the CBP Memo instructs officers to use "experience" and "physical observation" to determine whether they "believe[] that it is more likely than not" that the person whom they encounter in "[e]nforcement efforts on the SWB [southwestern border] and NB [northern border]," anywhere "within the area of operation of a Border Patrol station or POE operated by CBP," is "seeking to enter" without proper travel documents at or between POEs.  CBP Memo 1.

68.     Covered noncitizens "will be transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit."  CBP Memo at 3.  Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated

facility for limited holding prior to expulsion" to their home country.  *Id*.  Such facilities can be "a tent, soft-sided facility or predesignated CBP/USBP facility with dedicated space."  *Id*.

69.     The CBP Memo provides no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19.

70.     The CBP Memo does not exempt minors from forcible expulsion.

71.     CBP deported nearly 1,000 unaccompanied children in March and April.

72.     CBP has turned back multiple children to Mexico in the middle of the night.

73.     The number of referrals of unaccompanied children to ORR has thus plummeted.  Before the Title 42 Process, ORR shelters received as many as 77 children daily.  But in April, daily referrals dropped to the single digits, and ORR stated it received only 58 children from CBP that month.  That same month, CBP apprehended over 700 unaccompanied children at the Southwest border.  In May 2020, the total number of children in ORR custody was reportedly about 1,600, down from approximately 12,500 children in April 2019.

74.     CDC suggested in the May 20 Order that there has been a reduced rate of transmission and that this is due to reduced number of "covered aliens" at ports of entry and border patrol stations.  CDC, however, offered no evidence of this causal link.

75.     This complaint refers to the new regulation, all three of the CDC Orders—the original March 20 order, the April 20 extension, and the May 20 indefinite extension and amendment— and the CBP Memo collectively as the "Title 42 Immigration Process" or "Title 42 Process."

**Defendants Summarily Deported Plaintiff to El Salvador Under the Title 42 Process**

76.     Plaintiff G.Y.J.P. is a 13-year-old girl from El Salvador.  She is one of the many unaccompanied children who have been summarily expelled by CBP pursuant to the Title 42 Process.  She is now back in El Salvador, where she faces grave danger.

77.     G.Y.J.P.'s mother, M.R.P.S., is a former Salvadoran police officer.  M.R.P.S. received death threats from gang members and other police members because she refused to engage in corruption.  Afraid for her life, M.R.P.S. fled to the United States.  She was granted withholding of removal by an immigration judge in 2018, based on a finding that she would "more likely than not" be subject to persecution if she were sent back to El Salvador.  She left her daughter in the care of G.Y.J.P.'s grandmother.

78.     Because of her mother's refusal to engage in corruption, local gangs began targeting G.Y.J.P.  She was also threatened because she refused to accede to a gang member's pressure to become his girlfriend.  She tried to hide from the gangs, including changing schools, but gang members continued to find and threaten her.

79.     G.Y.J.P. fled El Salvador because she was afraid for her life and journeyed to the United States to seek safety and reunite with her mother.

80.     On or around April 21, 2020, G.Y.J.P. entered the United States, where CBP apprehended her.  During her apprehension, she fell into the Rio Grande River because she was trying to get away from CBP patrol dogs.  CBP sent her to the hospital.

81.     After a few hours in the hospital, she was taken to the Ursula Detention Center, a CBP facility in McAllen, Texas.  Medical personnel at Ursula took her temperature, asked if she had a fever, and conducted additional health screenings.  She did not exhibit any sign of having COVID-19.  G.Y.J.P. told officers about her mother, stating that her mother lives in New York, and providing her mother's name and phone number.  She also told officers that she feared she would be killed if returned to El Salvador.

82.     The officers put her in a cell for the night, and then moved her to a hotel, where she stayed for several days.  She initially shared a hotel room with another girl, before that child was

taken away, after which G.Y.J.P. was in the room by herself, with government officers watching over her.

83.     In the meantime, her mother was told by someone who had been apprehended with G.Y.J.P. that the child was in the custody of immigration authorities.  M.R.P.S. frantically tried to find her daughter.  When she called ORR, she was told that they did not have G.Y.J.P. in their custody.  While G.Y.J.P. was at the hotel awaiting expulsion, she was permitted to speak with her mother once over the phone for a few minutes.

84.     On or around April 27, 2020, late in the evening, officers pulled G.Y.J.P. out of her hotel room and drove her to the airport.  She was then flown back to El Salvador in the late night hours of April 27, 2020 or in the early morning hours the next day.

85.     By that time, G.Y.J.P. had spent almost a week in CBP custody.

86.     She is scared to remain in El Salvador and seeks to return to the United States, and is prepared to return to the country to seek asylum if she were given the opportunity.  She was tested for COVID-19 twice in El Salvador, and both tests were negative.

87.     The threat of persecution and torture to G.Y.J.P. is imminent and real.  El Salvador has one of the highest murder rates in the world and in particular gender-motivated killings of women and girls.

88.     The U.S. State Department Human Rights Reports for El Salvador document numerous threats to vulnerable populations, including police officers, their family members, and those who resist the gangs.  For example, the 2019 State Department Report states that "[o]rganized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, human trafficking, intimidation, and other threats and violence directed against police, judicial

authorities, . . . women, and members of vulnerable populations."  As recently as May 2020, the State Department reported that "[a] majority of serious crimes in El Salvador are never solved," and that "[g]ang members engage in violence or use deadly force if resisted."

89.     Children are not exempt from this widespread violence.  Indeed, many children are targeted specifically by gang members for recruitment, or retaliated against and threatened because of their family connections.  Children have experienced extreme harms ranging from threats against their lives and physical abuse to rape, kidnapping, and murder.  In particular, teenage girls in El Salvador face an extreme risk of homicide and sexual violence, as—for example—20% of all cases of missing women in 2018 were teenagers (12 to 17 years old).

90.     If Plaintiff is allowed to enter the United States, she could live with her mother, who currently resides in New York, and has a home ready and waiting for G.Y.J.P.  As needed, she could self-quarantine at her mother's home.

91.     Even if Plaintiff were required to first reside for a short time in an ORR children's shelter, she could do so safely.  There are ORR facilities that have experience with communicable diseases.  Moreover, because ORR facilities are currently well under capacity, social distancing and quarantine would be possible.

92.     Even before the Title 42 Process took effect, the ORR-contracted shelter network was operating significantly below capacity.  The system can house approximately 14,000 children. News reports stated that in the first two months of 2020, ORR was housing only about 2,000 to 3,000 children nationwide.

93.     After the Title 42 Process went into place, the numbers dropped even more precipitously. As of May 2020, the number of children detained in ORR custody was reportedly at about 1,600—approximately 11 percent of total capacity.

94.     Because Plaintiff could have been transferred directly to her mother or to an ORR shelter, she posed minimal, if any, risk to border agents when she entered.

95.     Similarly, because Plaintiff could be transferred directly to her mother or to an ORR shelter, she would pose minimal, if any, risk to border agents if she returns.

96.     Deporting G.Y.J.P. required her to remain in DHS custody far longer than the time it would have taken to transfer her to her mother or to an ORR facility.

97.     The Title 42 Process is not justified by public health concerns.  A principal justification is that border agents will have greater exposure if they are required to process individuals who lack documents and that it is therefore necessary to deport such individuals to reduce the risk to agents.  But, as Plaintiff's facts illustrate, arranging for air transport to deport individuals will take longer than the 72 hours in which DHS must transfer children to ORR or family members. In addition, where the individual shows no signs of COVID-19 or is tested, as Plaintiff was, the risk is even less.

**The Title 42 Process Is An Extreme Outlier**

98.     The Title 42 Process at issue here follows other invocations of COVID-19 by the Administration to ban immigration, but it is far more extreme in seeking to eliminate statutory protections for vulnerable noncitizens and children.  And it is not only a ban on entry, but provides for summary expulsion for those who entered the country.

99.     For example, in February and March of 2020, the President issued a series of Proclamations under 8 U.S.C. § 1182(f) to prohibit the entry of certain persons traveling from China, Iran, and certain European countries where COVID-19 was prevalent.  However, unlike the Title 42 Process, those Proclamations expressly stated that they did not restrict "any

individual's eligibility for asylum, withholding of removal, or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture."

100.    At the same time, the government continues to permit large numbers of people to enter the United States.  In addition to the Title 42 Process at issue here, DHS issued two other orders on March 20, 2020, which temporarily suspended "non-essential" travel from Canada and Mexico.  Under these orders, permitted "essential travel" broadly includes citizens, returning LPRs, individuals traveling for medical purposes, individuals traveling to attend education institutions, individuals traveling to work in the United States (e.g., agricultural workers), truck drivers moving cargo between the United States and Canada, emergency responders, and those engaged in military travel and operations.

101.    On May 22, 2020, Defendant Wolf issued an "exemption" from the President's Proclamations under 8 U.S.C. § 1182(f), which additionally permitted certain professional athletes, their staff, and their dependents to enter the country.  Defendant Wolf determined that it served "the national interest" to permit noncitizens who compete in, inter alia, the National Basketball Association, the Professional Golfers' Association Tour, and the National Hockey League, to enter the country and participate in sporting events.

102.    Hundreds of thousands of individuals continue to move back and forth across the U.S.-Mexico border every day.  Since March 20, 2020, when the Title 42 Process first went into effect, numerous individuals exempted from the ban have come into the United States.

103.    The Title 42 Process is inconsistent with how other countries have handled migration in the time of COVID-19, particularly with respect to asylum seekers and other vulnerable populations.  Numerous countries in Western Europe, such as Denmark, France, and Germany, have exempted asylum seekers from their immigration prohibitions, and permitted them to seek

relief from persecution from inside their countries.  And while Canada has imposed certain restrictions on the migration of adults without documentation if they do not enter at official ports of entry, it expressly exempts unaccompanied children from those restrictions.

104.    Despite Defendants' claimed fear of "introducing" infected individuals into the country, the United States is experiencing an outbreak of COVID-19 that is substantially more serious than most of its neighbors.  This country has the highest COVID-19 death toll and one of the highest infection rates in the entire world.  As of June 7, 2020, the United States had over 1.94 million confirmed cases of COVID-19, a rate of 5.91 people per thousand.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## (VIOLATION OF TVPRA, 8 U.S.C. § 1232, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

105.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

106.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The APA also provides relief for a failure to act: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

107.    The TVPRA, 8 U.S.C. § 1232, includes mandatory requirements for the processing, custody, release, and removal of unaccompanied children.  Defendants' forcible expulsion of G.Y.J.P. violated the statute in numerous ways, including that she should have been referred to the custody of HHS or her mother (rather than expelled to El Salvador); that she should have been placed in full removal proceedings before an immigration judge, where she would have had a full and fair opportunity to litigate her claims for relief; and that she has been deprived of

numerous statutory safeguards designed to facilitate her safe release into the United States and ensure the fairness of her removal proceedings.

108.    Defendants' expulsion of G.Y.J.P. pursuant to the Title 42 Process violated the TVPRA.

109.    As a result, Defendants' application of the Title 42 Process and regulation to G.Y.J.P. was contrary to law.  *See* 5 U.S.C. § 706(2)(A).

110.    Moreover, by refusing to grant G.Y.J.P. the statutory protections to which the TVPRA entitles her, and instead returning her to El Salvador where she faces threat of persecution and torture, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## SECOND CLAIM FOR RELIEF

## (*ULTRA VIRES*, VIOLATION OF THE PUBLIC HEALTH SERVICE ACT, 42 U.S.C. 265 AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

111.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

112.    Title 42 of the U.S. Code does not authorize the expulsion of noncitizens who are inside the United States.

113.    Title 42 of the U.S. Code also does not authorize the expulsion of children from the United States without affording them the protections of the TVPRA or other statutory protections afforded under the INA.  As a result, the application of the Title 42 Process to G.Y.J.P., which resulted in her expulsion from the United States and return to El Salvador, is contrary to law. *See* 5 U.S.C. § 706(2)(A).

114.    The Title 42 Process which was purportedly established pursuant to the authority of 42 U.S.C. § 265, was not authorized by that provision and is *ultra vires*.

115.    The application of the Title 42 Process to G.Y.J.P. is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF

### (VIOLATION OF 8 U.S.C. § 1231(b)(3), WITHHOLDING OF REMOVAL, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

116.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

117.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C.

§ 1231(b)(3), bars the removal of an individual to a country where it is more likely than not that

she would face persecution.

118.    Only an immigration judge can determine whether a minor faces a risk of persecution and

is entitled to withholding of removal after full removal proceedings in immigration court.  8

C.F.R. § 1208.16(a).

119.    Defendants applied the Title 42 Process and regulation to G.Y.J.P. without any of these

required safeguards.

120.    Application of the Title 42 Process and regulation to G.Y.J.P., resulting in her expulsion

to El Salvador where she faces threat of persecution and torture, therefore violated 8 U.S.C.

§ 1231(b)(3), and its implementing regulations.

121.    As a result, Defendants' actions against G.Y.J.P. were contrary to law.  *See* 5 U.S.C.

§ 706(2)(A).

122.    In addition, by refusing to grant G.Y.J.P. the procedures mandated by 8 U.S.C.

§ 1231(b)(3), and its implementing regulations, Defendants have withheld and unreasonably

delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## FOURTH CLAIM FOR RELIEF

### (ASYLUM: VIOLATION OF 8 U.S.C. § 1108(a), AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

123.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

124.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section . . . ."  8 U.S.C. § 1158(a)(1).

125.     Defendants' application of the Title 42 Process to G.Y.J.P. prevented her from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and was therefore contrary to law, *see* 5 U.S.C. § 706(2)(A).

126.     In addition, by refusing to grant G.Y.J.P. the meaningful opportunity to apply for asylum to which she is entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

### (VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

127.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

128.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that she would face torture.

129.     It is more likely than not that G.Y.J.P. will face torture if she remains in El Salvador.

130.     Pursuant to regulation, only an immigration judge, after full removal proceedings in immigration court, can determine whether a minor faces a risk of torture if removed from the United States.  8 C.F.R. § 1208.16(a).

131.     Defendants applied the Title 42 Process and regulation to G.Y.J.P., and summarily expelled her from the United States without placing her into full removal proceedings.

132.     The application of the Title 42 Process to G.Y.J.P., resulting in her expulsion to El Salvador where she faces threat of torture, therefore violated § 1231(b)(3), FARRA, and their implementing regulations.

133.     Defendants' actions were contrary to law.  *See* 5 U.S.C. § 706(2)(A).

134.     In addition, by refusing to grant G.Y.J.P. access to full removal proceedings, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

### (VIOLATION OF 8 U.S.C. § 1101, ET SEQ., AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

135.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

136.     The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

137.     The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "except otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

138.     The Title 42 Process creates an alternative removal mechanism.  The Title 42 Process purports to operate outside of the immigration laws set forth by Congress in Title 8.

139.     Because the Title 42 Process provides for the expulsion of G.Y.J.P. without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

140.     As a result, Defendants' actions against G.Y.J.P. were contrary to law.  *See* 5 U.S.C. § 706(2)(A).

141.     In addition, by refusing to grant G.Y.J.P. access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## SEVENTH CLAIM FOR RELIEF

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
## 5 U.S.C. § 706(2)(A))

142.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.    Defendants' actions are arbitrary, capricious, and contrary to law.  Defendants have not articulated a reasoned explanation for their decision to apply the Title 42 Process to G.Y.J.P.; failed to consider relevant factors in applying them to her, including her statutory protections as an unaccompanied child and her fears of persecution and torture in El Salvador; relied on factors Congress did not intend to be considered; failed to consider reasonable alternatives that were less restrictive; and offered no explanation for their decision to expel her from the country.

144.    G.Y.J.P.'s expulsion is arbitrary, capricious, and contrary to law because it also departs from the agency's existing policies for the processing, care, custody, and removal of unaccompanied children, including unaccompanied minors with contagious diseases, as well as prior policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff G.Y.J.P. respectfully prays this Court to:

a.    Declare unlawful the Title 42 Process as applied to G.Y.J.P.;

b.    Enter an order vacating G.Y.J.P.'s expulsion, vacating the Title 42 Process as applied to her, and enjoining Defendants from applying the Title 42 Process to her;

c.    Enter an order providing relief for G.Y.J.P. by ordering that Defendants return her for reprocessing of her application for admission without subjecting her to the Title 42 Process, and to afford her the TVPRA's statutory requirements and protections, as well as access to asylum, withholding of removal, CAT relief, and all other forms of relief to which she is eligible;

d.      Award Plaintiff's counsel reasonable attorneys' fees under the Equal Access to Justice

Act, and any other applicable statute or regulation; and,

e.      Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: June 8, 2020                              Respectfully submitted,

                                                 /s/Celso J. Perez
Stephen B. Kang*                                 Lee Gelernt*
Cody Wofsy*                                       Daniel A. Galindo*
Morgan Russell*                                   Celso J. Perez (D.C. Bar No. 1034959)
Adrienne Harrold*                                 American Civil Liberties Union Foundation,
American Civil Liberties Union Foundation,        Immigrants' Rights Project
Immigrants' Rights Project                        125 Broad Street, 18th Floor
39 Drumm Street                                   New York, NY 10004
San Francisco, CA 94111                           Tel: (212) 549-2600
Tel: (415) 343-0770

                                                 Karla M. Vargas*
Andre Segura*                                     Efren C. Olivares*
Kathryn Huddleston*                               Texas Civil Rights Project
Rochelle Garza*                                   1017 W. Hackberry Ave.
Brantley Shaw Drake*                              Alamo, Texas 78516
American Civil Liberties Union Foundation         Tel: (956) 787-8171
of Texas, Inc.
5225 Katy Freeway, Suite 350                      Robert Silverman*
Houston, Texas 77007                              Oxfam America
Tel. (713) 942-8146                               226 Causeway Street, Sute 500
                                                 Boston, MA 02114
Jamie Crook (D.C. Bar No. 1002504)                Tel: (617) 482-1211
Blaine Bookey
Karen Musalo                                      Scott Michelman (D.C. Bar No. 1006945)
Center for Gender & Refugee Studies               Arthur B. Spitzer (D.C. Bar No. 235960)
200 McAllister St.                                American Civil Liberties Union Foundation of
San Francisco, CA 94102                           the District of Columbia
Tel: (415) 565-4877                               915 15th Street NW, Second Floor
                                                 Washington, D.C. 20005
*Pro hac vice application forthcoming             Tel: (202) 457-0800


                                                 Attorneys for Plaintiff

29